# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

## Case No.: 1:19-cv-01162-PB

SHAWN MURPHY,

     Plaintiff,

vs.

STRAFFORD COUNTY, WILLIAM
WRENN, MICHAEL A. ZENK, SERGEANT
LEONARD NADEAU, LIEUTENANT
DONNA ROY, OFFICER DE SAO JOSE,
OFFICER ELIZABETH BAEZ, OFFICER
JACQUELIN VALENTINE, SCOTT J.
MARSHALL, JOHN S. MORIN, K.
LACASSE, GILBERT F. WILKINS,
BERNADETTE M. CAMPBELL, SARAH M.
PROVENCHER, CYNTHIA A DOMENICI,
DONNA J. DUFRESNE, and JOHN DOES 1-
20,

     Defendants.

---

## SECOND AMENDED COMPLAINT

Plaintiff Shawn Murphy brings this Second Amended Complaint for damages

against Defendants Strafford County, William Wrenn, Michael A. Zenk, Leonard Nadeau,

Donna Roy, De Sao Jose, Elizabeth Baez, Jacquelin Valentine, Scott J. Marshall, John S.

Morin, K. Lacasse,[1] Gilbert F. Wilkins, Bernadette M. Campbell, Sarah M. Provencher,

Cynthia A. Domenici, Donna J. Dufresne, and John Does 1-20.

## PARTIES

1.     Plaintiff Shawn Murphy is an inmate in the New Hampshire Department of

Corrections ("NHDOC"), specifically the New Hampshire State Prison for Men, located

---

[1] This Defendant's first name is unknown at this time.

at 281 North State Street, Concord, New Hampshire 03302.

2.      Defendant Strafford County is a county in the State of New Hampshire with a principal place of business at 259 County Farm Road, Dover, New Hampshire 03820. It operates the Strafford County Department of Corrections ("SCDOC"), a department within Strafford County that has a principal place of business at 266 County Farm Road, Dover, New Hampshire 03820.

3.      Defendant William Wrenn was the Commissioner for NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

4.      Defendant Michael A. Zenk was the Warden for NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

5.      Sergeant Leonard Nadeau was an employee of Strafford County at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

6.      Lieutenant Donna Roy was an employee of Strafford County at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

7.      Officer De Sao Jose was an employee of Strafford County at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

8.      Officer Elizabeth Baez was an employee of Strafford County at the time of the incidents alleged in this Second Amended Complaint and, upon information and

belief, is a resident of New Hampshire.

9. Officer Jacquelin Valentine was an employee of Strafford County at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

10. Scott J. Marshall was a Corrections Captain with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

11. John S. Morin was a Corrections Lieutenant with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

12. K. Lacasse was a Corrections Officer with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

13. Gilbert F. Wilkins was a Corrections Officer with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

14. Bernadette M. Campbell was an Administrator with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

15. Sarah M. Provencher was an Administrator with NHDOC at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

16. Cynthia A. Domenici was a nursing coordinator at New Hampshire

Hospital (a division of the Department of Health and Human Services) at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

17.     Donna J. Dufresne was a registered nurse at New Hampshire Hospital (a division of the Department of Health and Human Services) at the time of the incidents alleged in this Second Amended Complaint and, upon information and belief, is a resident of New Hampshire.

18.     Defendant John Does 1-20 were, at all relevant times, employees of NHDOC.  Any and all identifiable individuals, through discovery or otherwise, are sued in their individual and official capacities.

19.     The above-referenced employees and John Does 1-20 were acting within the scope of their employment during a portion of the times of the incidents and events below giving rise to this cause of action.  They are all being sued in their individual and official capacities.  All of the Defendants above have acted and continue to act under the color of law of the State of New Hampshire at all times relevant to this Second Amended Complaint.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (jurisdiction over claims arising under federal civil rights statutes).

21.     This Court has personal jurisdiction over Defendants because they are located and conduct business in New Hampshire.

22.     This court also has pendant/supplemental jurisdiction under 28 U.S.C. §

1367(a) over any state law claims herein.

23.     Venue is proper in this District because all the parties conduct business in this District, a substantial number of the acts alleged occurred in New Hampshire, and the Defendants referenced in this Second Amended Complaint and other witnesses reside in New Hampshire.

## FACTUAL BACKGROUND

**A.     The Incident**

24.     Video footage obtained from SCDOC shows that, on November 16, 2016, Mr. Murphy was pacing in the common area outside his cell (in Unit D) requesting assistance.  Mr. Murphy suffers from mental health issues and was peacefully requesting that he be allowed to speak with a mental health counselor.

25.     He exhibited no aggressive behavior or tendencies and was simply pacing back and forth appearing to speak aloud.  (There is no audio in the video.)

26.     After a couple of minutes, five corrections officers (Sergeant Nadeau, Lieutenant Roy, Officer Baez, Officer Jose, and Officer Valentine) approached him in an intimidating manner and directed him back to his cell.  Mr. Murphy complied, turned away, and walked back through the hallway to his cell.  The officers followed him there.

27.     When Mr. Murphy entered his cell, and while his back was facing the officers and the cell door began to close, Sergeant Nadeau sprayed Mr. Murphy with oleoresin capsicum spray, and then he (Sergeant Nadeau) and Lieutenant Roy entered the cell, grabbed Mr. Murphy, and pulled him and threw him on the floor in the hallway several feet in front of his cell door.  The remaining officers then surrounded him and savagely beat him, jumped on him, and restrained him.  During this onslaught, Sergeant

Nadeau yelled, "Someone tase him!"  Officer Baez reached for the conducted electrical weapon in Sergeant Nadeau's holster and deployed the device towards Mr. Murphy's back while he was face down.  Mr. Murphy then felt his left leg "snap" and then "pop" while the officers were on top of him.  He screamed, "My leg is fucked up!  You fucking broke my leg!"

28.     The medical records demonstrate the officers fractured Mr. Murphy's left mid-fibula.  The officers secured restraints to his arms.  Then one of the officers stated, "Okay, okay.  Enough.  Enough."  The officers pulled Mr. Murphy off the floor and forced him to walk – on his fractured leg with no apparatus to stabilize it – to the medical department.  While walking Mr. Murphy exclaimed repeatedly, "My leg is fucked up!" The officers ignored his cries.

29.     The officers' beating of Mr. Murphy, fracture of his leg, and discharge of a taser gun were unnecessary to protect their safety.  First, Mr. Murphy was not engaged in any misconduct: he was merely pacing back and forth and requesting assistance, and he walked back to and entered his cell when instructed to do so.  Second, there were *several* officers at the scene; Mr. Murphy – who is not an imposing individual by any stretch of the imagination – was significantly outnumbered.  Third, Mr. Murphy's act of turning away from the officers and walking back to and into his cell before the officers' first use of force and Mr. Murphy's position on the ground before he was tased demonstrated he was submissive to and compliant with the officers' commands.  The use of any kind of force, let alone the fracture of his leg and the use of a taser gun, was unnecessary.

30.     In addition, the officers' actions contradict the Taser ™ manufacturer's operating manual instructions.  Those instructions state an officer should "[c]ease force

6

once [the] subject surrenders or is captured or controlled," and that an "[e]motionally disturbed person (EDP) or mentally ill alone does not indicate immediate threat." Given the facts the officers were aware of Mr. Murphy's mental condition, Mr. Murphy was requesting assistance, and Mr. Murphy never posed any physical threat to the officers, especially once he was subdued on the ground, the officers should have never displayed any force, fractured his leg, or discharged a taser.

31. Accordingly, the officers' assault of Mr. Murphy, fracture of his leg, and use of a taser constituted excessive force under 42 U.S.C. § 1983 and violated Mr. Murphy's constitutional rights. In addition, their conduct is actionable under state common law theories such as assault, battery, and negligence.

**B.      Strafford County Disciplinary Reports**

32. One of the correctional officers involved in the incident (Sergeant Nadeau) drafted three "Disciplinary Board Forms" the following day, November 17, 2016, concerning the incident. Incredibly, these reports accuse *Mr. Murphy* of, among other things, "assault," "threat of assault," "attempting to tackle" and "headbutt" Sergeant Nadeau, "refusing to lock down when ordered to do so," and "causing a back up to be called resulting in several staff members being contaminated with O.C. spray and a transport to WDH."

33. Other reports concerning the incident similarly accuse Mr. Murphy of refusing to lock down, "tensing" his body, and blocking the doorway to his cell to prevent the officers from closing the door as he walked into it.

34. These reports exacerbate, rather than clarify, the officers' conduct. They contain critical discrepancies that demonstrate the officers' attempt to conceal their

misconduct following the incident.

35.     First, the video footage demonstrates Mr. Murphy did not assault, let alone attempt to "headbutt," anyone. He merely requested help, peacefully walked back to his cell when instructed to do so, and entered his cell upon returning there. Rather, the footage shows the only assault that occurred commenced when the officers yanked Mr. Murphy out of his cell and threw him to the floor and beat him.

36.     Second, the video footage does not support the reports' assertion that Mr. Murphy refused to lock down. As described above, he walked back to and entered his cell. Immediately upon entering the cell, Sergeant Nadeau and Lieutenant Roy entered behind him and pulled Mr. Murphy out of the cell. There could not have been an instruction to lock down, nor – in the time frame depicted in the video footage – was Mr. Murphy provided with a chance to comply with such an instruction if given.

37.     Third, some of the disciplinary reports omit the fact that Mr. Murphy was tased. Mr. Murphy's medical records state that prongs had to be pulled out of his back. Sergeant Nadeau makes no mention of this fact in his disciplinary reports. (Other officers, however, disclosed this fact in their incident reports.)

38.     These misrepresentations clearly demonstrate an intent and coordinated attempt to conceal the truth and the officers' misconduct.

**C.     Mr. Murphy's Stay at NHDOC and Ensuing Medical Care**

39.     Mr. Murphy was seen after the incident in the SCDOC nursing station. According to his medical records, taser prongs were removed from his lower back. Incredibly, ___*ice was applied to his ankle*___. This treatment was inadequate for the injury he suffered.

40.     Mr. Murphy was thereafter transported to the emergency department of Wentworth Douglass Hospital.  The attending physician was Samuel Trotzky, M.D.  At the time, Mr. Murphy rated his pain a 9 on a scale of 1 to 10.  X-rays were obtained and revealed a displaced spiral fracture of the left midshaft distal fibula.  He was placed in a splint and given a referral for orthopedic management.  He was then transported back to SCDOC and placed in intake because "medical cannot offer a single cell."

41.     Two days later, on November 18, 2016, Mr. Murphy was transported to the New Hampshire State Men's Prison (NHDOC) in Concord, NH.

42.     Upon arrival at NHDOC, the medical team at NHDOC delayed providing him with appropriate care: they observed Mr. Murphy's leg was swollen, bruised, and wrapped.  They denied, however, that it was fractured without obtaining verification from SCDOC.  That verification took nearly *four days* to receive.  Mr. Murphy was not provided with crutches or a cast until over a month later, on *December 20*, 2016.

43.     Indeed, on December 20, Mr. Murphy was finally transported to Dartmouth Hitchcock Medical Center and seen at a consultation with David Molind, P.A.  He reported continued pain since November 16 and the use of crutches.  Moderate edema was noted around the medial malleolus.  Imaging was obtained and revealed a comminuted fracture of the midshaft of the fibula, as well as some widening of his ankle mortis.  He was diagnosed with a Maisonneuve fracture of his lower left extremity.  (A Maisonneuve fracture refers to a combination of a fracture of the proximal fibula together with an unstable ankle injury (widening of the ankle mortise on x-ray), often comprising ligamentous injury (distal tibiofibular syndesmosis, deltoid ligament) and/or fracture of the medial malleolus.)  There was also a question of the possibility of a nondisplaced avulsion

fracture. He was instructed to keep the cast on and follow up in two weeks.

44.     Mr. Murphy was housed with the general population at NHDOC. Upon information and belief, crutches, leg braces, and similar apparatuses are not permitted in that area. Upon information and belief, Mr. Wrenn and Mr. Zenk were responsible for the policies that resulted in Mr. Murphy's placement in an area that prevented him from using these apparatuses. Indeed, as the below communications demonstrate, Mr. Murphy was not permitted to use any braces for his leg.

45.     Mr. Murphy was not brought back to Dartmouth Hitchcock as instructed. Instead, he was seen at a follow-up appointment on January 30, 2017, **_five weeks_** after his consult with Dr. Molind. When he arrived, he continued to report pain and tenderness. Dr. Molind observed Mr. Murphy's cast was **_off_** (likely due to the restriction against such apparatuses in NHDOC's general prison population). Mr. Murphy was unsure of when it was taken off. Dr. Molind remarked, "He comes in today with no bracing or assistive device on his lower extremity." Dr. Molind opined, "He has been incompletely treated at this point." He was provided an ASO-type brace for his ankle and was given a referral to physical therapy and instructed to return in **_one month_**.

46.     During this time and over the next several months, while at NHDOC, Mr. Murphy was overseen by several corrections officers and administrators, including, but not limited to, Scott J. Marshall, K. Lacasse, John S. Morin, Gilbert F. Wilkins, Bernadette M. Campbell, Sarah M. Provencher, and John Does 1-20.

47.     According to his NHDOC inmate file, Mr. Murphy made numerous requests for treatment and care concerning his leg, but many of those requests were ignored, and responses to others were delayed.

48.     For example, on January 31, 2017, Mr. Murphy submitted a request stating his leg was injured, and he requested a transfer. Upon information and belief, the corrections officer who received that request, K. Lacasse, took no action.

49.     At some point, Mr. Murphy's leg brace was taken from him. This was, again, likely due to the restriction against such apparatuses in NHDOC's general prison population. Further, for the next several months, no one at NHDOC did anything to remedy this problem (such as housing Mr. Murphy elsewhere, where he could use a leg brace without restriction).

50.     On February 15, 2017, Mr. Murphy submitted a request asking for a leg brace. The corrections officer who received the request, Mr. Marshall, recorded the following response, "I will call them and ask." Upon information and belief, Mr. Marshall took no further action.

51.     At the end of February, Mr. Murphy was not taken back to Dartmouth Hitchcock for a follow-up appointment as instructed.

52.     On March 2, 2017, Mr. Murphy submitted another request asking for a leg brace, among other items. He received no response to that request for nearly three weeks.

53.     Accordingly, on March 20, 2017, Mr. Murphy submitted ___another___ request inquiring about the status of a leg brace. He explained he was housed without a cast for over 30 days, a brace and physical therapy had been ordered, but a month had passed without any follow-up.

54.     The following day, March 21, 2017, Mr. Murphy finally received a response to his March 2 request. The corrections officer who received that request, Mr. Morin, responded, "CO Laclair has given you your property." As described above,

however, no one had provided Mr. Murphy with a leg brace.

55.     At some point that week, Mr. Murphy finally received a leg brace.  He experienced difficulty walking with it, however, and he was still receiving no physical therapy.  On March 23, 2017, he submitted another request, stating he had received a leg brace, but it hurt to walk in it, and nothing was being done to help him heal or provide him with physical therapy.

56.     In what was becoming a pattern, on March 28, 2017, an administrator, Bernadette M. Campbell, submitted a delayed response to Mr. Murphy's ***March 20*** request with the following remarks: "No current PT services.  Please follow up @ sick call for any issues."

57.     Then, on March 28, 2017, the same administrator, Ms. Campbell, responded to Mr. Murphy's March 23 request (sooner than before, but still five days later), stating, "Please [follow up] @ sick call to address this."

58.     Mr. Murphy was not brought back to Dartmouth Hitchcock by corrections officers and administrators until April 7, 2017 for a follow-up appointment, approximately five weeks after the time (end of February 2017) he was instructed to return.  During that appointment, he reported that corrections officers and administrators did not allow him to wear his ASO-type brace as recommended by Dr. Molind at his January 30 appointment. Additional x-rays were obtained that continued to reveal a Maisonneuve-type fracture, as well as widening of his syndesmosis with some lateral displacement of the talus. Surgical intervention was recommended, as was a CT scan of his ankle.  (The CT scan was not performed, however, until June 1, 2017 at Catholic Medical Center.).  It was also recommended he attempt to wear the ASO-type brace.

59.     He was seen again by Dr. Molind at Dartmouth Hitchcock on April 14, 2017.  He was once again diagnosed with a Maisonneuve fracture.

60.     After his return to NHDOC, Mr. Murphy submitted a request on May 7, 2017, stating his leg was "deformed."  He also explained he was following Ms. Campbell's earlier advice to "follow up" with "sick call" to address his concerns about his leg, but he "can't get [a] straight answer."  Apparently, the individuals at "sick call" were ignoring his requests.  A nursing coordinator from New Hampshire Hospital (a division of the Department of Health and Human Services), Cynthia A. Domenici, responded on May 8, 2017, stating, "Bottom bunk extended to 7/31/17."  In other words, Mr. Murphy's repeated complaints about the pain in his leg resulted in his being able to continue using the bottom bunk bed in his cell.

61.     At some point during this timeframe, Mr. Murphy was placed in the Secure Housing Unit ("SHU"), where leg braces were not allowed.  Thus, he was not permitted to wear his leg brace.

62.     The prohibition on wearing his leg brace combined with the half measure above (his using the bottom bunk bed) obviously continued to cause Mr. Murphy significant pain and complications: On May 31, 2017, Mr. Murphy submitted another request: "My leg was broken Nov 2016, in December[,] a cast was put on the leg by orthopedics.  They followed up Feb, ordered physical therapy, and gave be a brace to wear.  (SHU) does not permit the brace, so more damages are existing.  In April[,] I saw orthopedics again, new (x-rays) show[] my ankle is drastically out of place.  Ortho[] said he really wanted to order an operation to repair the bones/joints?  Because of the way it is healed?  The deformed ankle[] is difficult to put any weight on without crunching inside,

and causing pains.  I am hoping to get some relief, I can't have the brace that was ordered, and the (physical therapy) has not happened[.]  It's been months?  Please try to work on a resolution, soon?  My Naproxen does not work, it's expired.  I report this to (sick call) daily/weekly!  Thank you."  Mr. Murphy's request was forwarded to NHDOC's Medical and Forensic Services Division the following day, June 1, 2017.  It was ignored, however, for over two weeks.

63.     On June 1, 2017, Mr. Murphy finally underwent an ankle CT scan at Catholic Medical Center.

64.     Mr. Murphy was seen again at Dartmouth Hitchcock Medical Center on June 8, 2017 by Scott Devanny, M.D.  Mr. Murphy reported he was still experiencing pain and walking with a limp.  He also reported the same information in his May 31 request: he could not wear his leg brace because he was not allowed to in SHU.  He was scheduled to undergo surgery to repair his ankle later in June.  Dr. Devanny recommended he use the brace and crutches if possible.

65.     After returning to NHDOC, Mr. Murphy's condition continued to worsen. He submitted a request on June 12, 2017, requesting that he be moved, and that his leg was still broken.  An administrator, Sarah M. Provencher, responded with the statement, "Please see attached response."  There was no attachment.

66.     On June 15, 2017, Mr. Murphy finally received a response to his May 31 request from Ms. Domenici, stating, "Being admitted to HSC today."  (Upon information and belief, "HSC" refers to NHDOC's Medical and Forensic Services Division.)  He was finally moved on June 16, 2017.

67.     Approximately three weeks later, Mr. Murphy continued to experience

14

pain, and he was being forced to undertake physical activities he should have been avoiding.  For example, on July 10, 2017, Mr. Murphy submitted a request stating, "I have been experiencing some different issues throughout my time dealing with [the Medical and Forensic Services Division].  Complaints of (pain between 3 and 8)[.]. . . .  Being forced to live . . . regular housing, stairs etc. . .  Between months of (Feb – 2017 and the recent visits with orthopedics) orders for (physical therapy, ankle braces) were written by [Dartmouth Hitchcock Medical Center] of Concord, but weren't followed?  My most recent visits (April 2017 – June 2017) have shown the (fiblia[sp?] bone still broken) also the fracture in my ankle was overlooked, and is now unrepairable 'Dr. [Devanny]' explained this after reviewing (CT scans early June)[.]  I am frustrated with this news, along with reporting (sharp pains, with any movements in the (calves or ankle) without any weight bearing. Please review history/requests, orders, etc.  Look into relief options, as well as healing/pain management?  Thank you sincerely."

68.     Gilbert F. Wilkins (a corrections officer at NHDOC) forwarded Mr. Murphy's July 10 request to Ryan Landry, the Director of Nursing of NHDOC's Medical and Forensic Services Division.

69.     Mr. Murphy finally underwent surgery on July 19, 2017.  At the Concord Ambulatory Surgical Center, Dr. Devanny performed a left fibular open reduction and internal fixation surgery to repair his ankle.  Plates and screws were used to repair the fracture.

70.     On August 8, 2017, nearly a month after Mr. Murphy's July 10 request, Donna J. Dufresne, a registered nurse at New Hampshire Hospital (a division of the Department of Health and Human Services), responded to it: "You have had surgical

repair and a followup is scheduled."

71. Mr. Murphy was seen at a post-surgery follow-up on August 21, 2017, at Dartmouth Hitchcock by Dr. Molind. Dr. Molind ordered another round of x-rays. Mr. Murphy was noted to have some Achilles tendonitis. He was seen again by Dr. Molind on August 29, 2017. Dr. Molind recommended he wear a leg brace.

72. Mr. Murphy attended follow-up appointments on October 23, 2017, February 15, 2018, and October 5, 2018. At these appointments, further x-rays were obtained, a pain management consult was discussed, as well as physical therapy, and he was instructed to follow up as needed. At his October 23 appointment, Dr. Molind noted the fracture appeared to be healing, but it was displaced, and he recommended Mr. Murphy wean himself off a walking boot and use the leg brace. He recommended Mr. Murphy attend a follow-up appointment in eight weeks. That follow-up appointment occurred, however, 14 weeks later, on February 15 (as noted above). At his February 15 appointment, Dr. Molind noted the delayed healing of the fracture and a slight malalignment of the fracture.

73. Mr. Murphy attended follow-up appointments on May 9, 2019 and August 2, 2019. He continued to experience pain and continues treating for his injuries.

74. Mr. Murphy presented at an appointment on September 23, 2019, at the Health First Family Care Center. He reported continued lower left leg pain. Steroid injections administered at NHDOC had no effect. The pain was found to be radiating from his lower back to his left buttock. He was referred to an orthopedic specialist for further treatment.

75. Mr. Murphy's medical costs, as of the initial filing of this action in

November 2019, totaled over $15,505.96.

76.     The facts above demonstrate Mr. Murphy was consistently denied appropriate medical care.  After seven months – in approximately June 2017 – medical scans showed his leg was still fractured and not healed.  Surgery was delayed over seven months.  Now, after over three years, Mr. Murphy continues to experience persistent and debilitating pain in his leg.  He can hardly move his left foot without pain.  He had screws surgically inserted to support the bone, but this remedy has failed to alleviate his pain and disability.  Mr. Murphy formerly worked in flooring installation for many years.  After the conclusion of his sentence, he will not be able to work in that trade or similar trades requiring the use of his leg.

**D.     Mr. Murphy's Damages**

77.     The conduct above caused Mr. Murphy extensive pain, suffering, and emotional distress and mental anguish.  Mr. Murphy is entitled not only to significant compensatory damages within the jurisdictional limits of this Court, but also *punitive* damages, and recovery of his attorney's fees and costs.

**COUNT I**
**Use of Excessive Force**
**(42 USC § 1983)**
**(Mr. Murphy v. Strafford County, Sergeant Nadeau, Lieutenant Roy, Officer Baez, Officer Jose, and Officer Valentine)**

78.     Mr. Murphy incorporates each and every allegation made in the Paragraphs above as if fully set forth herein.

79.     42 U.S.C. § 1983 is a federal law that permits lawsuits for violations of constitutional rights.

80.     The Defendants above acted under color of law of the state of New

17

Hampshire.

81.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

82.     As described above, the Defendants above, while acting under color of state law, deprived Mr. Murphy of rights secured by the Fourteenth Amendment to the U.S. Constitution, by using excessive force on November 16, 2016, without provocation and without legitimate penal justification, and they failed to stop the unprovoked and unjustified excessive use of force against Mr. Murphy.

83.     As a direct and proximate result of these acts of excessive force, Mr. Murphy has suffered serious and ongoing physical and psychological injuries.

84.     This conduct was willful and exhibited a flagrant disregard for Mr. Murphy's federally-secured due process rights.  Accordingly, these Defendants are liable to Mr. Murphy under 42 U.S.C. § 1983.

**COUNT II**
**Deliberate Indifference to Medical Needs**
**(42 U.S.C. § 1983)**
**(Mr. Murphy v. All Defendants)**

85.     Mr. Murphy incorporates each and every allegation made in the Paragraphs above as if fully set forth herein.

86.     As described above, the Defendants above failed to ensure that Mr. Murphy received prompt and adequate medical care after the injuries he sustained on November 16, 2016.

87.     These actions exhibited deliberate indifference to Mr. Murphy's medical needs, were performed under color of state law, and violated Mr. Murphy's rights under

the Fourteenth Amendment to the U.S. Constitution.

88.     As a direct and proximate result of these actions in failing to ensure that Mr. Murphy received prompt and adequate medical care, Mr. Murphy was subjected to increased pain and the threat of serious physical injury.

89.     This conduct was willful and exhibited a flagrant disregard for Mr. Murphy's federally-secured rights. Accordingly, these Defendants are liable to Mr. Murphy under 42 U.S.C. § 1983.

**COUNT III**
**Intentional Infliction of Emotional Distress**
**(Mr. Murphy v. All Defendants)**

90.     Mr. Murphy incorporates each and every allegation made in the Paragraphs above as if fully set forth herein.

91.     Defendants, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. Murphy by the use of excessive force and their deliberate indifference to his medical needs.

92.     The conduct above is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

93.     As a result of this conduct, Mr. Murphy has suffered damages in the form of extreme mental anguish and severe depression, and he has suffered a deterioration of his physical and mental well-being.

**COUNT IV**
**Negligent Infliction of Emotional Distress**
**(Mr. Murphy v. All Defendants)**

94.     Mr. Murphy incorporates each and every allegation made in the Paragraphs above as if fully set forth herein.

95.     Defendants negligently caused severe emotional distress to Mr. Murphy by the use of excessive force and their deliberate indifference to his medical needs.

96.     Defendants knew or should have known this conduct would cause Mr. Murphy to suffer severe emotional distress.

97.     As a result of this conduct, Mr. Murphy has suffered damages in the form of extreme mental anguish and severe depression, and he has suffered a deterioration of his physical and mental well-being.

WHEREFORE, Mr. Murphy respectfully prays for judgment against Defendants and the following remedies:

A.     Compensation for lost income, including lost future income;

B.     Compensation for the violation of his constitutional rights and emotional distress and injury;

C.     Enhanced compensatory damages;

D.     Punitive damages;

E.     Pre- and post-judgment interest;

F.     Recovery of Mr. Murphy's reasonable attorney's fees and expenses;

G.     Any other relief this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims so triable.

<div style="margin-left: 50%;">

SHAWN MURPHY,

By His Attorneys,

FOJO LAW, P.L.L.C.

</div>

Dated: May 15, 2020

*/s/ Robert M. Fojo*
Robert M. Fojo (#19792)
264 South River Road, Suite 464
Bedford, NH 03110
Direct: (603) 473-4694
rfojo@fojolaw.com

TEALE LAW, P.L.L.C.

*/s/ Charles C, Teale*
Charles C. Teale (#19888)
1000 Elm Street, Suite 803
Manchester, NH 03101
Tel: (603) 935-7425
cteale@tealelaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF on May 15, 2020. I also certify that this document is being served this day on all counsel of record via transmission of Electronic Filing generated by CM/ECF.

*/s/ Robert M. Fojo*
Robert M. Fojo