UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Case No.: 1:19-cv-01162-PB

SHAWN MURPHY,

    Plaintiff,

vs.

STRAFFORD COUNTY, WILLIAM WRENN, MICHAEL A. ZENK, SERGEANT LEONARD NADEAU, LIEUTENANT DONNA ROY, OFFICER DE SAO JOSE, OFFICER ELIZABETH BAEZ, OFFICER JACQUELIN VALENTINE, SCOTT J. MARSHALL, JOHN S. MORIN, K. LACASSE, GILBERT F. WILKINS, BERNADETTE M. CAMPBELL, SARAH M. PROVENCHER, CYNTHIA A DOMENICI, DONNA J. DUFRESNE, and JOHN DOES 1-20,

    Defendants.

## PLAINTIFF'S OBJECTION TO STATE DEFENDANTS' MOTION TO DISMISS

Plaintiff Shawn Murphy objects to the State Defendants' Motion to Dismiss ("Motion to Dismiss")[1] and provide, below, their incorporated Memorandum of Law in support of same.[2]

### MEMORANDUM OF LAW

**A.    Standard of Review**

The standard of review for a motion to dismiss does not need to be recited in full. One aspect of it, however, bears emphasis. At the beginning of their Memorandum, Defendants rely on *Leite v. Bergeron*, 911 F.3d 47 (1st Cir. 2018). *Id.* at 8. *Leite* was an appeal of a summary

---

[1] The State Defendants are William Wrenn, Michael A. Zenk, Scott J. Marshall, John S. Morin, Kimberly A. Lacasse, Gibert F. Wilkins, Bernadette M. Campbell, Sarah M. Provencher, Cynthia A. Domenici, and Donna J. Dufresne.
[2] Mr. Murphy will be filing a notice of voluntary dismissal as to Defendants Wrenn and Zenk.

judgment decision, not a motion to dismiss. In *Leite*, the First Circuit reviewed extensive evidence that was discovered and submitted at summary judgment in the district court and concluded there was no evidence that a correctional officer was aware of any specific evidence that the plaintiff faced a heightened risk of assault, or that he was assaulted and in need of medical treatment; and no evidence that the officer had any suspicion that an inmate needed medical attention when she conducted one of her rounds. 911 F.3d at 53. In contrast, this case is still at the pleadings stage, where Defendants concede "[t]he Court assumes the truth of the plaintiff's well-pleading facts and draws all reasonable inferences in the plaintiff's favor." Doc. 29-1 at 2 (quoting *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018)).

Here, the Second Amended Complaint alleges – and the Court must assume as true – many allegations concerning the Defendants, and the Court may infer various facts and conclusions from those allegations in an effort to construe them in Mr. Murphy's favor for purposes of evaluating the Defendants' Motion to Dismiss.

**B.     Count II States a Valid Claim for Relief**

Defendants claim Mr. Murphy has failed to allege viable inadequate medical care claims against them individually. Doc. 29-1 at 9. This is inaccurate.

"In order to succeed on a deliberate-indifference claim based on inadequate medical care, 'a plaintiff must satisfy both a subjective and objective inquiry.'" *Nolet v. Armstrong*, 197 F. Supp. 3d 298, 305 (D. Mass. 2016) (quoting *Leavitt v. Correctional Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011)). "Subjectively, he must show 'that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety.'" *Id.* "Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." *Johnson– El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989). For example, in *Nolet*, the District Court

held allegations that three individual defendants responsible for an inmate's treatment took the inmate off pain predication even though he claimed to be in paid from an open would were "enough to state a claim for deliberate indifference to a serious medical need." 197 F. Supp 3d at 305. Similarly, in *Abernathy v. Dewey*, 277 F. Supp. 3d 129 (D. Mass. 2017), the District Court held a defendant's refusal to provide medical treatment to a plaintiff despite being aware of the extent of his injuries, including the fact those injuries would become aggravated if untreated, raised a plausible inference of deliberate indifference. *Id.* at 141; *see also Barbosa v. Conlon*, 962 F. Supp. 2d 316, 334 (D. Mass. 2013) (plaintiffs stated a claim, where they repeatedly asked for medical assistance for visible injuries, but their requests were denied); *Villanueva v. Franklin Cty. Sheriff's Office*, 849 F. Supp. 2d 186, 191 (D. Mass. 2012) (denying motion to dismiss, where prisoner alleged he suffered from "severe, debilitating pain in his mouth" over a one-month period, and defendants knew of this pain but failed to provide medical treatment other than "ineffective pain medication"); *Cardona–Santiago v. Corr. Health Servs. Corp.*, No. CIV. 13–1348 DRD, 2015 WL 1417425, at *9 (D.P.R. Mar. 27, 2015) ("denying a prisoner effective pain medication" may constitute inadequate medical care in violation of the Eighth Amendment). In *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991), the Sixth Circuit held a nurse's failure to dispense prescribed pain medicine was sufficient to state an Eighth Amendment claim, even where the would healed normally). Even one instance of contact with a plaintiff after an injury is enough to establish liability. *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981). So is a minor delay in treatment, as little as two days. *See id.* (holding defendants were liable for a two-day delay in receiving treatment that resulted in greater pain).

Objectively, Mr. Murphy must establish that the deprivation alleged was 'sufficiently serious.'" *Nolet*, 197 F. Supp. 3d at 305. "A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Dadd v. Anoka Cnty.*, 827 F.3d 749, 755 (8th Cir. 2016). "The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Coleman v. Rahija*, 114 F.3d 778, 786 (8th Cir. 1997).

### 1. Lacasse and Marshall

Defendants argue Count II should be dismissed as to Lacasse and Marshall because Mr. Murphy's allegations that they received requests from Mr. Murphy concerning his leg (one requesting a brace and the other requesting a transfer) are not sufficient for a personal-capacity claim under section 1983 for inadequate medical care. Doc. 29-1 at 12. This is inaccurate.

There is no question Mr. Murphy has stated a claim against Lacasse and Marshall. The Complaint alleges Lacasse and Marshall were among the corrections officers who oversaw him when he was housed at NHDOC. *See* Doc. 26 ¶¶ 10-12, 46. Mr. Murphy "submitted a request" on January 31, 2017 (just two months after his injury), "stating his leg was injured, and he requested a transfer." *Id.* ¶ 48. The Complaint alleges "Lacasse[] took no action." *Id.* The following month (three months after his injury), Mr. Murphy "submitted a request asking for a leg brace." *Id.* ¶ 50. Although the Complaint alleges Marshall received that request and responded, "I will call them and ask," it alleges "Marshall took no further action." *Id.* The Complaint then alleges that, "[a]t the end of February, Mr. Murphy was not taken back to Dartmouth Hitchcock for a follow-up appointment as instructed." *Id.* ¶ 51. On January 30,

2017, during a visit to Dartmouth Hitchcock, Dr. Molind had advised that he return in month month.  *Id.* ¶ 45.

These allegations (both directly and by inference) sufficiently state a claim that Lacasse and Marshall had the requisite knowledge Mr. Murphy had a serious medical need (his complaints about his leg and requests for action), and they were deliberately indifferent to it (they took no action).  Thus, the Court should deny Defendants' request to dismiss Count II as to Lacasse and Marshall.

### 2. **Morin and Provencher**

Defendants argue Count II should be dismissed as to Morin and Provencher because Mr. Murphy's allegations that they, too, received requests from Mr. Murphy concerning his leg (one requesting a brace and the other requesting he be transferred, and that his leg was still broken) are not sufficient for a personal-capacity claim under section 1983 for inadequate medical care.  Doc. 29-1 at 13.  This is also inaccurate.

The Complaint alleges – and Defendants mostly omit – that the request for a leg brace that Morin received came from Mr. Murphy on March 2, 2017, and Mr. Murphy did not receive a response to that request for "nearly three weeks."  Doc. 26 ¶ 52.  Morin responded to that request on March 21, and the Complaint alleges he disclaimed all responsibility for Mr. Murphy's request, stating another corrections officer, "Laclair[,] has given you your property."  *Id.* ¶ 54.  The Complaint alleges, however, "no had provided Mr. Murphy with a leg brace."  *Id.*  The Complaint alleges Provencher responded to another transfer request from Mr. Murphy on June 12, 2017, which also stated his leg was still broken, with a reference to "an attached response" that was never provided.  *Id.* ¶ 65.

5

These allegations (both directly and by inference) sufficiently state a claim that Morin and Provencher had the requisite knowledge Mr. Murphy had a serious medical need (his complaints about his leg and requests for action), and they were deliberately indifferent to it (they took no action or failed to ensure he was provided with the treatment he requested). Thus, the Court should deny Defendants' request to dismiss Count II as to Morin and Provencher.

### 3. Campbell, Domenici, Wilkins, and Dufresne

Defendants argue Count II should be dismissed as to Campbell, Domenici, Wilkins, and Dufresne because Mr. Murphy's allegations concerning their responses to his requests are also not sufficient for a personal-capacity claim under section 1983 for inadequate medical care. Doc. 29-1 at 13-14. This is also inaccurate, and Defendants omit critical information from their recitation of the relevant allegations.

Mr. Murphy's interactions with each of these Defendants transpired as follows:

**Campbell**: Mr. Murphy submitted a request on March 20, 2020, "inquiring about the status of a leg brace. He explained he was housed without a cast for over 30 days, a brace and physical therapy had been ordered, but a month had passed without any follow-up." Doc. 26 ¶ 53. (This was *after* Mr. Murphy had waited *nearly three weeks* for a response to his March 2 request, which Morin finally answered on March 21. *See supra* pp. 4-5.). *After* Mr. Murphy finally received a leg brace – and complained that it hurt to walk in it, *see id.* ¶ 55 – he received a response from Campbell (an administrator) on March 28. *Id.* ¶ 56. Despite the facts Mr. Murphy referenced an order for physical therapy, and explained he had no leg brace and he had had no follow-up for 30 days, Campbell dismissed his complaints and responded only with "No current PT services. Please follow up @ sick call for any issues." *Id.* The same day, Campbell also responded to Mr. Murphy's March 23 request in a similarly dismissive manner: "Please [follow up] @ sick call to address this." *Id.* ¶ 57. The Complaint then alleges "Mr. Murphy was not brought back to Dartmouth Hitchcock by corrections officers and administrators until April 7, 2017 for a follow-up appointment, approximately five weeks after the time (end of February 2017) he was instructed to return." *Id.* ¶ 58. Mr. Murphy would later explain in a May 7 request that Campbell's directives above produced no results: his complaints to "sick call" were ignored. *Id.* ¶ 60.

**Domenici**: In his May 7 request, Mr. Murphy stated "his leg was 'deformed,'" and he explained, as noted above, that "he was following Ms. Campbell's earlier advice to 'follow up' with 'sick call' to address his concerns about his leg, but he 'can't get [a] straight answer.'" *Id.* Domenici, a nursing administrator, responded the following day,

stating, "Bottom bunk extended to 7/31/17." *Id.* Despite repeated complaints about his leg, including that it was "deformed," Domenici did nothing other than allow him to continue using the bottom bunk of his cell. *Id.* On May 31, Mr. Murphy submitted a lengthy request explaining his injury, the cast he had on his leg, his orders for physical therapy, his many doctor's visits, the deformity, the pain he was experiencing, his lack of a brace, the ineffectiveness of his pain medication, his many requests to "sick call," and his pleas for a "resolution." *Id.* ¶ 62. Domenici responded *over two weeks later*, on June 15: "Being admitted to HSC today," (which is believed to be the Medical and Forensic Services Division). *Id.* ¶ 66.

**Wilkins**: On July 10, Mr. Murphy submitted another request, again explaining the history of his injury, the issues he had experienced with the Medical and Forensic Services Division, complaints of his pain, his doctor's visits, lack of a leg brace, his lack of follow-up and physical therapy, his deformity, and requests for help. *Id.* ¶ 67. Wilkins merely forwarded that request to the Director of Nursing, and there is no indication he took any further action, or that Mr. Murphy's requests were addressed. *Id.*

**Dufresne**: No one responded to Mr. Murphy's July 10 request until August 8, when Dufresne (a registered nurse at New Hampshire Hospital) stated, "You have had surgical repair and a followup is scheduled." *Id.* ¶ 70. Mr. Murphy was not seen for a follow-up until August 21. *Id.* ¶ 71.

These allegations (both directly and by inference) sufficiently state a claim that these Defendants had the requisite knowledge Mr. Murphy had a serious medical need (his numerous, detailed – and often grotesque – complaints about his leg and requests for action). Even a layperson reading these requests would understand Mr. Murphy had serious medical issues concerning his leg. *See Dadd*, 827 F.3d at 755 ("A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"). Defendants also attempt to view each of Mr. Murphy requests in a vacuum, as if one corrections officer or administrator could not possibly know what the other knew about Mr. Murphy's status and condition. The Court may infer, however, that each of these Defendants was aware of Mr. Murphy's complaints and his condition given the circumstantial evidence of his many requests and explanations concerning his leg. *Coleman*, 114 F.3d at 786 ("The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious.").

These allegations also sufficiently state a claim that these Defendants were deliberately indifferent to Mr. Murphy's condition: they significantly delayed their responses (often by *weeks*) and/or took no action or failed to ensure he was provided with the treatment he requested, or that his requests were addressed at all. The Court should deny Defendants' request to dismiss Count II as to Campbell, Domenici, Wilkins, and Dufresne.

## C. The Doctrine of Qualified Immunity Does Not Bar Count II

Defendants argue Count II should be dismissed under the doctrine of qualified immunity because it does not allege the Defendants violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. Doc. 29-1 at 16-17. This is inaccurate.

### 1. Defendants have waived their qualified immunity defense.

"[Q]ualified immunity shields government officials performing discretionary functions from civil liability for money damages when their conduct does not violate `clearly established' statutory authority or constitutional rights of which a reasonable person would have known.'" *Dimarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001) (internal citation omitted). It is an "affirmative defense, and thus the burden of proof is on defendants." *Id.* This defense necessarily requires ***identifying what discretionary functions were performed***. *See id.*

Defendants spend a short paragraph on this argument and provide nothing but conclusory allegations that Mr. Murphy "cannot meet" his "burden," and the Defendants "have not located *any* case demonstrating that the Eighth or Fourteenth Amendment right to adequate medical care extends to the specific conduct Mr. Murphy alleges." Doc. 29-1 at 17. The Court should decline to rule on this issue because Defendants have failed to develop the argument. *Latimore v. Trotman*, CIVIL ACTION No. 14-13378-MBB, at *27 (D. Mass. Aug. 23, 2017) ("[B]ecause [defendant] does not develop his qualified immunity defense with sufficient specificity and

detail, the defense is waived for purposes of this motion."). Indeed, in *Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31 (1st Cir. 2007), the First Circuit held the district court did not abuse its discretion in holding the defendants waived their qualified immunity defense to the plaintiff's First Amendment claims because the defendants' motion for summary judgment did not mention the words "First Amendment" and devoted just three sentences broadly invoking their qualified immunity. *Id.* at 37.

Here, Defendants commit the same error. They spend three-quarters of a page reciting the law concerning qualified immunity, but then they spend a short, six-line paragraph generally arguing Mr. Murphy's allegations are barred by qualified immunity because they purportedly do not violate a statutory or constitutional right that was "clearly established." Doc. 29-1 at 17. Thus, the Court should decline to rule on that argument and find the Defendants waived it.

**2. Mr. Murphy alleges the violation of rights that were "clearly established."**

To the extent any substantive arguments can be gleaned from Defendants' assertion of qualified immunity, Count II alleges violations of rights that were "clearly established." In *Dadd*, for example, the Eighth Circuit held the defendants were not entitled to qualified immunity because the plaintiff alleged the violation of his constitutional right to adequate medical care while in custody. 827 F.3d at 755-56. The defendants (several deputies and one nurse) deliberately disregarded his serious medical needs when they ignored his requests for help or treatment after he informed them of his pain. *Id.* at 755. Here, Count II alleges the same constitutional right (Mr. Murphy's right to adequate medical care) was violated. Thus, the Defendants are not entitled to qualified immunity.

**D.  Counts III and IV State Valid Claims for Relief**

Defendants argue Mr. Murphy's claims for intentional and negligent infliction of emotional distress fail to state claims for relief because the conduct he alleges does not meet the standard for those claims.  Doc. 29-1 at 18-19.  This is inaccurate.

Conduct supporting a claim for deliberate indifference to medical needs, including the denial of requests for treatment, supports claims for intentional and negligent infliction of emotional distress.  *See Barbosa*, 962 F. Supp. 2d at 334 (plaintiffs repeatedly asked for medical assistance for visible injuries, but their requests were denied).

Mr. Murphy alleges similar conduct here.  He alleges the Defendants had the requisite knowledge he had a serious medical need because of his complaints about his leg and requests for action, and they refused to address his concerns.  Thus, the Court should deny Defendants' request to dismiss Counts III and IV.

**E.  RSA 99-D Does Not Bar Counts III and IV**

Defendants argue RSA 99-D bars Counts III and IV.  Doc. 29-1 at 19-20.  This is inaccurate.

"RSA chapter 99-D protects officers from liability 'for decisions, acts or omissions that are: (1) made within the scope of their official duties while in the course of their employment; (2) discretionary, rather than ministerial; and (3) not made in a wanton or reckless manner.'"  *Beaulieu v. N.H. Governor*, 2018 DNH 221, 9-10 (quoting *Farrelly v. City of Concord*, 168 N.H. 430, 440 (2015)).

If the conduct alleged does not satisfy these criteria, however, then statutory immunity does not apply.  *See id.*  For example, in *Doe v. Calumet City*, 161 Ill. 2d 374 (Ill. 1994), *overruled on other grounds*, *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30 (Ill. 1998), the Illinois Supreme Court held there was a jury question as to whether a police officer who failed to

help the plaintiff's children at the scene of a crime exhibited willful and wanton conduct, thus negating the application of Illinois's similar immunity statute. *Id.* at 390. Similarly, in *Ortiz v. Kazimer*, No. 1:11 CV 01521 (N.D. Ohio Mar. 26, 2015), the district court held a police officer used excessive force during a stop and, thus, acted in a "wanton or reckless" manner, thus negating the application of Ohio's immunity statute. *Id.* at *19. Similarly, in *Engle v. Nettle*, No. 5:14-cv-1161 (N.D. Ohio Aug. 1, 2016), the district court denied the defendant's request for summary judgment as to the plaintiff's claims for trespass and intentional infliction of emotional distress because there were questions of fact as to whether the defendant police officers acted in a "wanton or reckless manner' when they entered the plaintiff's home without consent and conducted a search of the premises. *Id.* at *34-*35.

Counts III and IV allege facts that demonstrate the Defendants acted in a "wanton or reckless manner" when they refused to address Mr. Murphy's numerous complaints about his leg, including a deformity in it, excruciating pain, his lack of physical therapy and follow-up doctor's appointments, and his lack of a leg brace. The Defendants are not statutorily immune from these claims under RSA 99-D.

## CONCLUSION

For the foregoing reasons, Mr. Murphy respectfully requests that the Court (1) deny the Defendants' Motion to Dismiss; and (2) grant any other relief deemed just and necessary.

SHAWN MURPHY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated: September 4, 2020

   */s/ Robert M. Fojo*
Robert M. Fojo (#19792)
264 South River Road, Suite 464
Bedford, NH 03110
Direct: (603) 473-4694
rfojo@fojolaw.com

TEALE LAW, P.L.L.C.

   */s/ Charles C, Teale*
Charles C. Teale (#19888)
1000 Elm Street, Suite 803
Manchester, NH 03101
Tel: (603) 935-7425
cteale@tealelaw.com

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF on September 4, 2020. I also certify that this document is being served this day on all counsel of record via transmission of Electronic Filing generated by CM/ECF.

   */s/ Robert M. Fojo*
Robert M. Fojo