# EXHIBIT A



FOJO LAW, PLLC
264 South River Road,
Suite 460
Bedford, NH 03110

Robert M. Fojo
Direct/Fax: (603) 473-4694
rfojo@fojolaw.com

**\*\*\*SUBJECT TO FRE 408\*\*\***
**\*\*\*The following statements, information, and settlement offer are for settlement purposes only and shall not be admissible at trial.\*\*\***

November 1, 2019

**Via USPS First Class Mail and Via Email**

John Curran
Gallagher, Callahan & Gartrell, P.C.
214 N. Main Street
Concord, NH  03301

**Re:    Shawn M. Murphy, Sr.**

Dear Attorney Curran:

I am writing concerning Shawn Murphy, an inmate at the Strafford County Department of Corrections ("DOC"), regarding an incident that occurred on or about November 16, 2016, where – in response to Mr. Murphy's request for assistance, a group of correctional officers accosted him and beat him, fractured his left mid-fibula, and deployed an electroshock weapon on his back while he was in restraints on the floor.

**ENCLOSURES**
All Medical Records, Bills, Incident Reports, and other files as referenced throughout this Demand are contained on the DVD enclosed with the mailing of this letter.  Please refer to the appropriate DVD file when indicated.

**Summary of the Incident**

Video footage obtained from the DOC shows that, on November 16, 2016, Mr. Murphy was pacing in the common area outside his cell (in Unit D) requesting assistance.  Mr. Murphy suffers from mental health issues and was peacefully requesting that he be allowed to speak with a mental health counselor. He exhibited no aggressive behavior or tendencies and was simply pacing back and forth appearing and speaking aloud (There is no audio in the video.)  After a couple of minutes, several correctional officers approached him in an intimidating manner and

directed him back to his cell. Mr. Murphy complied, turned away, and walked back through the hallway to his cell. The officers followed him there.

When Mr. Murphy entered his cell, one of the officers entered the cell, grabbed Mr. Murphy, and pulled him and threw him on the floor in the hallway several feet in front of his cell door. The remaining officers then surrounded him and savagely beat him, jumped on him, and restrained him. Mr. Murphy felt his left leg "snap" and then "pop" while the officers were on top of him. He screamed, "My leg is fucked up! You fucking broke my leg!" Indeed, the medical records demonstrate the officers fractured Mr. Murphy's left mid-fibula. The officers secured restraints to his arms. While he was face down on the floor in restraints, one of the officers deployed a taser into his back. Then Lieutenant Roy stated, "Okay, okay. Enough. Enough." The officers pulled Mr. Murphy off the floor and, shockingly, forced him to walk – on his fractured leg with no apparatus to stabilize it – to the medical department. While walking Mr. Murphy exclaimed repeatedly, "My leg is fucked up!" The officers ignored his cries.

Mr. Murphy was seen at the medical department (a summary of Mr. Murphy's medical treatment follows). Two days later, Mr. Murphy was transported to the New Hampshire State Prison for Men in Concord, NH. The medical team at the prison delayed providing him with appropriate care: they observed Mr. Murphy's leg was swollen, bruised, and wrapped. They denied, however, that it was fractured without obtaining verification from the Strafford County DOC. That verification took nearly *four days* to receive. Mr. Murphy was not provided with crutches or a cast until *December 20*, 2016.

Mr. Murphy treated for his injuries through various medical while he was housed with the general population in the prison for the next several months. Crutches, leg braces, and similar apparatuses are not permitted in that area. As a result, he continued to be denied appropriate care. After seven months – in approximately June 2017, medical scans showed Mr. Murphy's leg was still fractured and had not healed. His leg was not surgically repaired until July 2017.

Now, after nearly three years, Mr. Murphy continues to experience persistent and debilitating pain in his leg. He can hardly move his left foot without pain. He had screws surgically inserted to support the bone, but this remedy has failed to alleviate his pain and disability. Mr. Murphy formerly worked in flooring installation for many years. After the conclusion of his sentence, he will not be able to work in that trade or similar trades requiring the use of his leg.

**Medical**
*(See Folders: Records and Bills)*

**NH DOC Nursing Station**
**November 16, 2016**

Mr. Murphy was seen following the altercation in the NH DOC nursing station on 11/16/16 and ice was applied to his ankle, which treatment was completed inadequate for his significant injury.

**Wentworth Douglass Hospital**
**November 16, 2016**
*Samuel Trotzky, MD*

On November 16, 2016, Mr. Murphy was seen in the emergency department of Wentworth Douglass Hospital with injuries to his left leg at which time he rated his pain a 9 on a scale of 1 to 10. X-rays were obtained and revealed a displaced spiral fracture of the left midshaft distal fibula. He was placed in a splint and given a referral for orthopedic management.

Dartmouth Hitchcock Medical Center
**December 16, 2016 to August 2, 2019**
*David Molind, PA & Scott Devanny, MD*

On December 16, 2016, one month following his injury, Mr. Murphy was finally transported to Dartmouth Hitchcock Medical center and seen at consultation with David Molind, PA. He reported continued pain since November 16, 2016 and the use of crutches. Moderate edema was noted around the medial malleolus. Imaging was obtained and revealed a comminuted fracture of the midshaft of the fibula, as well as some widening of his ankle mortis. He was diagnosed with a Maisonneuve fracture of his lower left extremity. There was also a question of the possibility of a nondisplaced avulsion fracture. He was instructed to keep the cast on and follow up in 2 weeks.

He was not brought back as instructed, but rather seen at follow up on January 25, 2017, five weeks following his consult with Dr. Molind. He continued to report pain and tenderness and Dr. Molind opined that he had been incompletely treated for his injuries. He was provided an ASO-type brace for his ankle and was given a referral to Physical Therapy and instructed to return in one month.

He was not brought back by officers until April 7, 2017 for follow up, at which time he reported that prison officials did not allow him to wear his ASO-type brace as recommended by Dr. Molind. Additional x-rays were obtained which continued to reveal a Maisonneuve-type fracture, as well as widening of his syndesmosis with some lateral displacement of the talus. Surgical intervention was recommended at that time, as was a CT scan of his ankle, which was obtained on June 1, 2017 at Catholic Medical Center.

He was seen again at Dartmouth Hitchcock Medical Center on June 8, 2017 by Dr. Devanny. At that time, he continued to experience pain and reported walking with a limp. Again, he reported being unable to wear his brace due to orders of the prison. He was schedule to undergo surgical intervention to repair his ankle, which occurred on June 19, 2017.

Mr. Murphy was seen at a post ORIF follow up on August 21, 2017 and repeat x-rays were ordered. He was noted to have some Achilles tendonitis.

Mr. Murphy presented at follow ups on October 23, 2017, February 15, 2018, October 5, 2018. At these appointments, further x-rays were obtained, a pain management consult was discussed, as was as physical therapy and instructed to follow up as needed.

He followed up again on May 9, 2019 and August 2, 2019. He continues to experience pain and treat for his injures.

### Catholic Medical Center
**June 1, 2017**

On June 1, 2017, Mr. Murphy underwent an ankle CT scan at Catholic Medical Center.

### Concord Ambulatory Surgical Center
**July 19, 2017**

On July 19, 2017, Mr. Murphy underwent left fibular open reduction and internal fixation surgery to repair his ankle which was performed by Dr. Devanny at Concord Ambulatory Surgical Center at which time plates and screws were used to repair the fracture.

### Health First Family Care Center
**September 23, 2019**

Sean presented with continued lower left leg pain. Steroid injections administered at the prison had no effect. The pain was found to be radiating from his lower back to his left buttock. He was referred to an orthopedic specialist for further treatment.

## FINANCIAL LOSS STATEMENT

| | |
|---|---|
| Wentworth Douglass Hospital (11/16/16) | $1,524.00 |
| Dartmouth Hitchcock Medical Center (12/16/16 – 8/2/19) | $7,303.00 |
| Catholic Medical Center (6/2/17) | $1,990.00 |
| Concord Ambulatory Surgical Center (7/19/17) | $4,481.00 |
| Health First | $207.96 |
| **TOTAL MEDICAL:** | **$15,505.96** |

**The Disciplinary Reports**

One of the correctional officers involved in the incident (Sergeant Nadeau) drafted three "Disciplinary Board Forms" the following day, November 17, 2016, concerning the incident. Incredibly, these reports accuse *Mr. Murphy* of, among other things, "assault," "threat of assault," "attempting to tackle" and "headbutt" Sergeant Nadeau, "refusing to lock down when ordered to do so," and "causing a back up to be called resulting in several staff members being contaminated with O.C. spray and a transport to WDH."

These reports exacerbate, rather than clarify, the officers' conduct. They contain critical discrepancies that demonstrate the officers' attempt to conceal their misconduct following the incident.

First, the video footage demonstrates Mr. Murphy did not assault, let alone attempt to "headbutt," anyone. He merely requested help, peacefully walked back to his cell when instructed to do so, and entered his cell upon returning there. Rather, the footage shows the only assault that occurred commenced when the officers yanked Mr. Murphy out of his cell and threw him to the floor and beat him.

Second, the video footage does not support the reports' assertion that Mr. Murphy refused to lock down. As described above, he walked back to and entered his cell. Immediately upon entering the cell, one of the officers entered behind him and pulled Mr. Murphy out of the cell. There could not have been an instruction to lock down, nor – in the time frame depicted in the video footage – was Mr. Murphy provided with a chance to comply with such an instruction if given.

Third, the reports omit the fact that Mr. Murphy was tased. Mr. Murphy's medical records state that prongs had to be pulled out of his back. Sergeant Nadeau makes no mention of this fact in his reports. Mr. Murphy's medical records also confirm that he was pepper sprayed.

These misrepresentations clearly demonstrate an intent and coordinated attempt to conceal the truth and the officers' misconduct.

**The Officers' Misconduct**

The officers' beating of Mr. Murphy, fracture of his leg, and discharge of a taser gun were unnecessary to protect their safety. First, Mr. Murphy was not engaged in any misconduct: he was merely pacing back and forth and requesting assistance, and he walked back to and entered his cell when instructed to do so. Second, there were *several* officers at the scene; Mr. Murphy – who is not an imposing individual by any stretch of the imagination – was significantly outnumbered. Third, Mr. Murphy's act of turning away from the officers and walking back to and into his cell before the officers' first use of force and Mr. Murphy's position on the ground before he was tased demonstrated he was submissive to and compliant with the officers' commands. The use of any kind of force, let alone the fracture of his leg and the use of a taser gun, was unnecessary.

In addition, the officers' actions contradict the Taser ™ manufacturer's operating manual instructions. Those instructions state an officer should "[c]ease force once [the] subject surrenders or is captured or controlled," and that an "[e]motionally disturbed person (EDP) or mentally ill alone does not indicate immediate threat." Given the facts the officers were aware of Mr. Murphy's mental condition, Mr. Murphy was requesting assistance, and Mr. Murphy never posed any physical threat to the officers, especially once he was subdued on the ground, the officers should have never displayed any force, fractured his leg, or discharged a taser.

Accordingly, the officers' assault of Mr. Murphy, fracture of his leg, and use of a taser constituted excessive force under 42 U.S.C. § 1983 and violated Mr. Murphy's constitutional rights. In addition, their conduct is actionable under state common law theories such as assault, battery, and negligence.


**The Law**

42 U.S.C. § 1983 is a federal law that permits lawsuits for violations of constitutional rights. To assert a viable cause of action, "a plaintiff must allege that the defendants, while acting under color of state law, deprived him of rights secured by the Constitution or federal law." *Rojas-Velazquez v. Figueroa-Sancha*, 676 F.3d 206, 209 (1st Cir. 2012). There is no question here that the officers involved in the incident were acting under color of state law: they are New Hampshire state correctional officers. Thus, the only question is whether their actions constituted excessive force and deprived Mr. Murphy of a federally-assured right.

They did. It is well-settled that the gratuitous use of force on an individual who has already been subdued or who poses no threat to anyone's safety is unconstitutional. *Roberts v. Mangold*, 240 F. App'x 675, 677 (6th Cir. 2007). Numerous courts have found section 1983 violations for excessive force, or allowed such cases to proceed to trial, in instances where law enforcement officers discharged a taser gun on a victim who was not a threat to anyone's safety, for example after behind handcuffed or subdued. In many of these cases, the victim even exhibited some resistance to the officers' efforts, attempted to flee the scene, insulted the officers, and were charged with crimes. Many of these cases have been summarized below for your reference.

In *Davis v. Rennie*, 264 F.3d 86 (1st Cir. 2001) the First Circuit upheld punitive damages awards of over $1 million collectively against six state workers (including $500,000 against a nurse, which the trial court later remitted by half) who restrained and repeatedly punched a mental health patient. (The jury awarded only $100,000 in compensatory damages.) The court concluded the jury could have found the workers acted with "evil motive" towards the plaintiff because they taunted him, and several of them did nothing to protect him while he was punched.

In *Beaver v. City of Federal Way*, No. CV05-1938 MJP, 2006 U.S. Dist. LEXIS 83097 (W.D. Wash. Nov. 3, 2006), the district court held, following a jury trial, that the fourth and fifth discharges of a taser gun by an officer during an arrest for a residential burglary violated the plaintiff's constitutional rights. The officer found the plaintiff, who was visibly under the influence of drugs, fleeing the scene. The plaintiff was six feet tall and "heavyset." The officer ordered the plaintiff to halt. When he refused, the officer discharged his taser gun. The plaintiff

fell to the ground.  He was able to prop himself up on his elbows.  The officer fired his taser a second time, sixteen seconds after the first one.  The plaintiff again fell to the ground.  The officer commanded the plaintiff to lie on his stomach and extend his arms out to his side.  The plaintiff said repeatedly, "I can't," and did not comply.  The officer tased the plaintiff a third time, just two seconds after the second one.  A second officer arrived to find the plaintiff on his side, rolling and resting on one elbow.  After the second officer and first officer gave conflicting commands to the plaintiff (one told him to lie on his back; the other told him to lie on his stomach), the second officer commanded the first officer to tase the plaintiff a fourth time, which he did, ten seconds after the third tase.  The plaintiff was now on his stomach, but his arms were curled under his chest.  22 seconds later, the officer discharged his taser a fifth time.  The plaintiff extended his hands over his head, and the officers finally handcuffed him.  The court concluded the final two discharges of the officer's taser gun were not objectively reasonable and constituted excessive force because two officers were present during that time, the plaintiff's non-compliance with the officers' commands resulted – in part, due to his altered state of mind – from his inability to do so, and the plaintiff was on the ground and obviously impaired and dazed.  The district court further noted that the officers' insistence that they were permitted to use the taser to shield themselves from any possibility of harm conflicted with their training, which instructed them to use a taser "only to stop a threat" and never for physical coercion.  The court also held the second officer was equally responsible for subjecting the plaintiff to a deprivation of his constitutional rights because she failed to intercede when the first officer tased the plaintiff a fifth time and ordered him to tase him a fourth time.

In *Parker v. Gerrish*, 547 F.3d 1 (1st Cir. 2008),[1] the First Circuit affirmed a jury's verdict that a police officer used excessive force in tasering the plaintiff during a traffic stop.  Although the plaintiff insulted one of the officers, he complied with the first officer's many requests and did not resist arrest, including requests he exit the vehicle, perform several sobriety tests, and allow them to handcuff him.

In *Roberts v. Mangold*, 240 F. App'x 675 (6th Cir. 2007), the Sixth Circuit held an officer's use of a taser on the plaintiff, who – following a dispute with his wife – returned to the house to find his wife there with police officers and ran away, was objectively unreasonable.  The officer used the taser on the plaintiff, another officer then tackled the plaintiff, and then they pinned him to the ground and repeatedly discharged the taser on him.  The Court held a jury could conclude the officer used excessive force.

In *Tucker v. Las Vegas Metropolitan. Police Department*, No. 09 17141, 2012 U.S. App. LEXIS 4341 (9th Cir. Mar. 2, 2012), the Ninth Circuit affirmed the district court's denial of the police department's motion for summary judgment as to the plaintiff's claim for excessive force when they tased him and applied body pressure to restrain him *after* he was handcuffed and face down on a bed.  The officers testified that the plaintiff continued to threaten their safety, and that they exercised considerable restraint in their use of force.  The district court, however, identified significant discrepancies and omissions in the officers' respective accounts of the altercation.  The Ninth Circuit concluded a jury might discredit the officers, and conclude – in light of the danger the plaintiff posed once handcuffed, if any, (including his physical and mental state – he was delirious – at the time) – the degree of force used was excessive.  The court further

---

[1] *Parker* was abrogated on other grounds in *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009).

concluded "genuine issues of material fact remain[ed] as to both the extent of the force used by the officers and the nature of the threat posed by [the plaintiff]'s handcuffed resistance" and, therefore, "cannot hold that the officers acted reasonably as a matter of law." *Id.* at *5.

In *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), the Eighth Circuit affirmed the district court's denial of a police officer's motion for summary judgment. In doing so, the Court held there was a genuine issue of material fact as to whether the officer's use of a taser during a routine traffic stop constituted excessive force in violation of the plaintiff's constitutional rights. The plaintiff was not violent, fleeing, or resisting arrest; posed no threat to anyone's safety; and only disobeyed two orders from the officer to end a 911 phone call.

In *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), the Tenth Circuit also affirmed the district court's denial of the defendants' motion for summary judgment. In that case, the plaintiff went to a municipal courthouse to contest a traffic ticket. After losing his case, he walked to the parking lot to retrieve money from his truck to pay the fine. He mistakenly carried the court file with him to his truck, which could have been charged as a misdemeanor. On his way back to the courthouse, a police officer grabbed him and tackled him, and other officers arrived. They tasered him several times and beat his face into the concrete. He was charged with resisting arrest and obstructing a peace officer. The Court held the use of a taser constituted excessive force because, in part, the plaintiff was not a threat to anyone's safety: he did not resist arrest or attempt to flee, and the police officers were the aggressors.

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), the Sixth Circuit held there was a genuine issue of material fact as to whether the use of a taser on a potentially homicidal and suicidal individual who was holding a knife in each hand and had made threatening statements to police officers constituted excessive force.

In *Rios v. City of Fresno*, No. CV-F-05-644 OWW/SMS, 2006 U.S. Dist. LEXIS 85642, (E.D. Cal. Nov. 14, 2006), the district court denied the police officers' motion for summary judgment. The officers pulled over the plaintiff, a bus driver, for an alleged unsafe lane change. The officers confronted the plaintiff outside the bus. The plaintiff clenched his fists. Believing the plaintiff would attempt a physical confrontation, the officers asked him several times to sit down on a nearby curb. The plaintiff refused. The officers then instructed him that, if he did not cooperate, they would arrest him. The plaintiff continued to refuse their requests and even chided them, "go for it." One of the officers attempted to take hold of the plaintiff's arm so he could be arrested. The plaintiff pulled his arm away and brought his arms in front of him to avoid being handcuffed. Another officer attempted to grab hold of his arm. At that point, the first officer stepped back and deployed a taser. The plaintiff fell to the ground, and he was taken into custody without further incident. He was criminally prosecuted for resisting arrest. The case was later dismissed. Other accounts of the event conflict with these alleged facts, particularly whether the plaintiff attempted to resist arrest. The district court concluded there was a genuine dispute of material fact as to whether the plaintiff resisted arrest at all, and, thus, reasonable minds could differ as to whether a taser should have been employed or whether any force should have been employed. *Id.*

In *Harris v. County of King*, No. C05-1121c, 2006 U.S. Dist. LEXIS 67752 (W.D. Wash. Sept. 21, 2006), the district court denied an officer's motion for summary judgment in connection with the plaintiff's claim for excessive force. A group of officers tased the plaintiff three times in connection with an arrest on a felony warrant. The plaintiff was under the influence of methamphetamines and weighed approximately 300 pounds. The plaintiff had complied with the officers' orders, and he had his back to the officers and his hands held up, when the officers tased him the first time. Although the plaintiff pulled the taser darts out of his skin and stomped them on the ground, he had his back to the officers once more and held his hands up again when they tased him the second and third times. The court held the use of the taser was unnecessary to protect the officers' safety, and the plaintiff's submissive behavior posed no threat.

Finally, in *LeBlanc v. City of Los Angeles*, No. CV 04-8250 SVW (VBKx), 2006 U.S. Dist. LEXIS 96768 (C.D. Cal. Aug. 16, 2006), the district court found an officer's use of a taser gun on a handcuffed victim constituted excessive force. A private security guard called 911 after finding the plaintiff, who was "large and strong," wandering in the middle of a street and suspected the plaintiff was either under the influence of drugs or mentally ill. The security guard had handcuffed the plaintiff to a fence while the police arrived. When the police arrived, the plaintiff tugged at his handcuff and swung his arm twice at one of the officers. He continued to do so. The officers concluded the plaintiff was likely under the influence of a PCP and decided to take him to the hospital for medical treatment. The police tased the plaintiff, who fell to the ground. The officers then positioned him on his stomach. One of the officers sat on him to keep him down. The plaintiff attempted to push himself up. The officer tased him a second time. He dropped back down, and the officers fastened restraints on him. The district court held the officers used unreasonable force, in part, by using the taser gun on the plaintiff because he was vulnerable, already handcuffed to the fence, and not a suspect for a serious or dangerous crime, and less intrusive means were available to effect his arrest.

**Damages/Demand**

As described in part above, the officers' actions caused Mr. Murphy extensive pain, suffering, and mental anguish. A jury would likely award Mr. Murphy not only significant compensatory damages, but also *punitive* damages, and – assuming he prevails – Mr. Murphy's attorneys would likely be awarded their attorney's fees and costs.

1. **Compensatory Damages**

Mr. Murphy would be entitled to an award of compensatory damages for the physical pain and suffering and emotional distress he experienced as a result of the incident. Juries have awarded, and courts have affirmed, significant awards of compensatory damages for both based solely on a plaintiff's testimony and despite no expert medical evidence of such pain or distress.

For example, in *Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009), the Seventh Circuit affirmed a compensatory damages award of $75,000 for an inmate who was grabbed, thrown against the wall, slammed on the floor, and had a correctional officer's knees pressed against his back. The inmate produced no expert medical evidence and only described that he experienced

increased pain in his back (beyond the pain he was already experiencing as a result of an unrelated car accident) as a result of the attack.

In *Frunz v. City of Tacoma*, 468 F.3d 1141 (9th Cir. 2006), the Ninth Circuit affirmed a compensatory damages award of $27,000 against three police officers who unlawfully entered the plaintiff's home, pointed a gun at her, slammed her against the ground, and handcuffed her.

In *Boesing v. Spiess*, 540 F.3d 886 (8th Cir. 2008), the Eighth Circuit affirmed a compensatory damages award of $5,000 for a plaintiff who was sprayed with mace and struck in the head with a baton while face down on the ground. There was "no evidence that he incurred any medical expenses or other out-of-pocket costs, or that he suffered any long-lasting, negative health effects as a result of his injuries." *Id.* at 882. The plaintiff, however, "testified that he experienced pain and suffering during the two-week period it took his injuries to heal." *Id.*

In *Rogers v. Cofield*, 2011 U.S. Dist. LEXIS 141083 (D. Mass. Dec. 8, 2011), the court denied a defendant police officer's motion for remittitur as to two jury awards – one for $26,188.30 for past compensatory damages, which included damages for emotional pain and suffering, and one for $75,000 for *future* emotional pain and suffering -- where the plaintiff suffered only minor injuries. The only evidence of emotional distress consisted of the plaintiff's testimony that he experienced "humiliation and mental anguish" because the fact the officer pushed and restrained him happened in front of his children. *Id.* at *114. "He testified about experiencing a devastating feeling," being a "mental wreck," "experiencing pain, fear, anxiety, nervousness and anger," being "upset, shocked and surprised," and having "a continuing fear of the police." *Id.* at *114-15. As to the award for future emotional pain and suffering, the court noted "there was no expert testimony about his mental anguish or testimony about seeking psychiatric treatment or taking medication." *Id.* at *121. The court concluded, however, that "plaintiff's testimony provides sufficient evidence to support the future compensatory damages award of $75,000.00 for mental pain and suffering." *Id.*

In *Hall v. Ochs*, 817 F.2d 920 (1st Cir. 1987), the First Circuit upheld a $100,000 emotional distress award for an arrest, where the plaintiff suffered only minor injuries (he was forcibly removed from his car), because, in part, the plaintiff had recurring nightmares and a continuing fear of the police. *Id.* at 927.

Finally, in *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36 (1st Cir. 2009), the First Circuit affirmed an award of $35,000 for emotional distress, where a group of police officers surrounded and threatened the plaintiff. *Id.* at *46. The plaintiff offered no expert testimony concerning his emotional distress, and the court rejected the defendants' argument that such testimony was necessary: "A plaintiff does not need to present expert testimony to recover damages for emotional distress caused by the violation of his civil rights." *Id.* at *47. Rather, the plaintiff testified the incident as "being nearly violent and causing him to feel 'impotent, flustered, fearful.'" *Id.* He also testified he "remained anxious about the possibility of reprisals against his family and friends." *Id.* at *47.

Here, Mr. Murphy's injuries are *far worse*. His leg was fractured during the assault, and he now has significant disabilities associated with that injury. He also suffered significant pain from the

tase. He has described the pain as excruciating and overwhelming, and he felt as if he had lost complete control over himself and his body. It was more painful than anything he has ever experienced. In addition to the physical pain, Mr. Murphy has suffered significant emotional anguish as a result of the incident. He is anxious, nervous, and upset. A jury would likely award Mr. Murphy a significant amount for his gruesome injury and the overall pain and suffering he has experienced.

### 2. Punitive Damages

Mr. Murphy would also be entitled to an award of punitive damages against the *individual* officers for their actions. "The Supreme Court has held that a jury may be permitted to assess punitive damages in an action under [section] 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991) (quoting *Smith v. Wade* 461 U.S. 30, 56 (1983)). "[A] punitive damages award may be 'justified not only by defendants' actions on [the date in question] but also by **_their subsequent behavior_**.'" *Davis*, 264 F.3d at 115 (quoting *Hall v. Ochs*, 817 F.2d 920, 927 (1st Cir. 1987)) (emphasis added).

In *Davis* (referenced above), the First Circuit upheld punitive damages awards of over $1 million collectively against six state workers (including $500,000 against a nurse, which the trial court later remitted by half) who restrained and repeatedly punched a mental health patient. (The jury awarded only $100,000 in compensatory damages.) The court concluded the jury could have found the workers acted with "evil motive" towards the plaintiff because they taunted him, and several of them did nothing to protect him while he was punched. In addition, the court noted the jury could have found that several of the workers tried to cover up the assault, where the nurse (against whom the jury awarded $500,000 in punitive damages) wrote "Unknown when or how injury sustained" and "Unknown to writer precipitants to occurrence" in her report, and three other workers (including the nurse) lied when they testified that they did not see the nurse punch the plaintiff.

In *Hendrickson* (cited above), the Seventh Circuit affirmed a punitive damages award of $125,000 for an inmate who was grabbed, thrown against the wall, slammed on the floor, and had a correctional officer's knees pressed against his back. The court held the inmate made no threatening gestures towards the officer, and the officer's use of force was gratuitous and intended solely to cause pain.

In *Frunz* (cited above), the Ninth Circuit affirmed a punitive damages award of $111,000 against three police officers who unlawfully entered the plaintiff's home, pointed a gun at her, slammed her against the ground and handcuffed her.

In *Boesing* (cited above), the Eighth Circuit affirmed a punitive damages award of $20,000 for a plaintiff who was sprayed with mace and struck in the head with a baton while face down on the ground. There was, as noted above, "no evidence that he incurred any medical expenses or other out-of-pocket costs, or that he suffered any long-lasting, negative health effects as a result of his injuries." *Id.* at 882.

Here, the officers' conduct was motivated by evil motive or intent, or – at a minimum – involved reckless or callous indifference to Mr. Murphy's rights. First, as demonstrated above, the officers' pulling and throwing of Mr. Murphy, jumping on top of him, fracture of his leg, and deployment of the taser were all unnecessary because Mr. Murphy never posed a threat to them: he turned around and walked away from the officers and into his cell before the first use of force, and he was on the floor likely face-down when his leg was fractured and he was tased. Second, the officers' omission of the fact they tased Mr. Murphy *after* the incident misrepresents specific aspects of the incident and clearly demonstrates an evil motive directed at Mr. Murphy. A jury would likely award Mr. Murphy a significant amount to punish the officers' conduct.

### 3. Attorney's Fees and Costs

If this case proceeds to litigation, and Mr. Murphy prevails at trial, he will likely be entitled to an award of attorney's fees and costs.

42 U.S.C. § 1988(b) states, "In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." *See also Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991). The court may also include a plaintiff's expert fees in such an award. 42 U.S.C. § 1988(c). "The prevailing party 'should ordinarily recover an attorney's fee unless special circumstances would render an award unjust.'" *Nydam*, 948 F.2d at 812 (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968)) (upholding award of $26,306.85).

### 4. Demand

Mr. Murphy is demanding Six Hundred Thousand Dollars ($600,000) as compensation for the violation of his constitutional rights and his injuries, as detailed above. This demand is consistent with similar cases – also involving the illegal use of physical force and tasers against victims who posed no threat to law enforcement officers – that counsel has reviewed from other states, some of which were resolved out of court. As demonstrated above, this demand is also very reasonable, and far less than Mr. Murphy could recover if this case proceeds to litigation.

Sincerely,

Robert M. Fojo

CC:    Client
          Charles C. Teale, Esq.